# Federal Defenders

## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

October 30, 2023

**VIA EMAIL & ECF**
The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:  ***United States v. Jose Irizarry***
      **23 Cr. 60 (JMF)**

Dear Judge Furman,

The Court should not remand Jose Irizarry following his guilty plea to a drug conspiracy in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B) because there are exceptional reasons why his detention pending sentencing would not be appropriate. 18 U.S.C. § 3145(c).

Preliminarily, Mr. Irizarry clearly does not present a danger to the community and is not a flight risk. 18 U.S.C. § 3143(b)(1)(A). Rather, since his arrest and bail in July 2022, Mr. Irizarry has maintained a steady, full-time job as a porter at an apartment complex and is currently the sole provider for his family, including his wife and two small children, one of which was born this past April. He has a robust and supportive family network, some of whom are co-signers to his personal recognizance bond, and he is actively engaged in outpatient mental health and substance abuse treatment in coordination with his pre-trial services officer. He never misses an appointment and has always provided paystubs confirming his employment. By any measure, Mr. Irizarry has been—and will continue to be—a model pre-trial supervisee.

Against this backdrop, there are two principal reasons to continue Mr. Irizarry's bail pending sentencing under 18 U.S.C. § 3145(c). First, the conditions at MDC Brooklyn remain so dire and decrepit that, "where a defendant is not a risk of flight, is not a danger to the community, and there aren't special reasons for them to be remanded, avoiding putting a defendant in conditions like that qualifies as an exceptional reason under 3145(c)." Plea Transcript at 33, *United States v. Arias*, 22 Cr. 495 (PAE) (S.D.N.Y. May 5, 2023) (allowing a defendant who pleaded guilty to

possessing with intent to distribute several kilograms of fentanyl to remain on bail pending sentencing) (attached as Exhibit A). Put simply, "MDC [Brooklyn] is too dreadful a place to put someone who isn't a risk of flight or danger to the community." *Id.* at 34.

Second, Mr. Irizarry is currently receiving treatment and evaluation for cardiac distress that is related to a possible coronary obstruction. He is presently engaged with a cardiologist and has appointments forthcoming to determine the extent of the problem and the appropriateness of surgical intervention, including stenting and open heart surgery. It is axiomatic that Mr. Irizarry will not receive the appropriate care and preventative heart treatment he requires if he is remanded to MDC Brooklyn. Depriving Mr. Irizarry of the ability to see his medical treatment through before he is sentenced would not only present an unjustified threat to his life, but would also thwart the Court's ability to meaningfully apply 18 U.S.C. § 3553(a)(2)(D) to his circumstances and fashion a sentence (including a placement recommendation) based on an accurate and thoughtful assessment of his medical needs. Accordingly, the Court should continue Mr. Irizarry's bail pending sentencing.

## Jose Irizarry's Personal Background, Character, and Identity as a Father

Jose Irizarry was born in 1983 to Teresa Irizarry and Jose Parra in Harlem Hospital. He grew up in Washington Heights with his mother, his maternal grandmother Maria, and three older siblings. His father was in and out of his life, and often incarcerated. Mr. Irizarry's father occasionally supported his family financially, but he was not a reliable presence. Mr. Irizarry's mother was a phone operator and his grandmother was a nurse at Harlem Hospital. Although growing up in Washington Heights in the 1990s was fraught with drugs and crime, Mr. Irizarry fondly remembers his earliest childhood years and the time he spent surrounded by his grandmother, mother, and siblings.

As Mr. Irizarry grew into a teenager, however, his life changed. In 1997, when he was 14, Mr. Irizarry's beloved grandmother passed away without much warning. Mr. Irizarry's father was in prison, and two of his older siblings, Luis and Yesenia, had also moved out of the house. His other sister, Michelle, who was closest in age to him, turned inward and consumed herself with school and work. Mr. Irizarry's mother, Teresa, also became more distant as she had to pick up night shifts to compensate for losing his grandmother's income. Once insulated by a loving support network, Jose was now coming of age essentially alone, left to his own devices in an environment that presented many challenges, temptations, and negative influences. After dropping out of school in the 10th grade, it was not long before Mr. Irizarry's life spiraled out of control. He began abusing drugs, primarily Percocet, picked up his first criminal case at 18 for selling ecstasy, and had a child, Jose Francisco, when he was 19.

For the next 15 years, Mr. Irizarry struggled to regain stability and he became heavily reliant on Percocet and other pills to get by and to dull the anger and pain he felt inside. Mr. Irizarry's estrangement from his father was especially challenging. Although he would visit his father in prison from time to time, Mr. Irizarry considered the man to be nothing more than his "biological father" who saw his family infrequently between prison bids. When Mr. Irizarry's father died in 2008, he recalls feeling cold, bitter, and angry at the world around him. He was arrested later that same year, arrested again in 2011, and again in 2016—the latter case resulting in his imprisonment for four years in New York State.

When Mr. Irizarry was released from state custody in April 2020, COVID-19 was still roaring through the City. Forced into a new environment of lockdowns and massive layoffs, Mr. Irizarry turned inward and retreated to his family. Shortly after he returned home from state prison, Mr. Irizarry reconnected with Marlene Rodriguez, his best friend growing up who lived on the same block as him. They began a romantic relationship and Mr. Irizarry moved in with her and her two daughters. Mr. Irizarry's parole was also terminated early on June 24, 2020.

 At first, Mr. Irizarry supported himself and contributed to his household primarily through a settlement check that he received after being the victim of violence on Rikers Island. The incident was gruesome and scary. While detained on Rikers following his arrest in 2016, Mr. Irizarry was one of a few "Spanish" people on his unit, and he was frequently antagonized by other inmates for the family and monetary support he received. One day, Mr. Irizarry was attacked and a fight broke out. Eventually, correctional officers stopped the fight and placed Mr. Irizarry and his assailants in handcuffs. While he was handcuffed, however, Mr. Irizarry was suddenly slashed on the face, neck, and right shoulder by a different inmate. Unable to defend himself because he was handcuffed, Mr. Irizarry was terrified that the man would kill him. Although the settlement check Mr. Irizarry received was meant to compensate him for the City's failure to protect him, he still carries emotional and physical scars from the attack.



*Mr. Irizarry and Ms. Rodriguez*

In October 2021, Mr. Irizarry obtained a job as a porter in a Harlem residential building where he continues to work full time, 40 hours per week, at approximately $20 per hour. In January 2022, Mr. Irizarry and Ms. Rodriguez had their first child together, Killian, and this past April, they welcomed a daughter, Naimah. Although she is a trained social worker, Ms. Rodriguez left work to raise her and Mr. Irizarry's children full time. In addition to the four children he is raising with Ms. Rodriguez, Mr. Irizarry also supports his eldest son, Jose

3

Francisco, who is now 21 years old and a student at SUNY Buffalo, and his mother, who lives in Throggs Neck.

Mr. Irizarry is determined to be the kind of present, loving, and responsible father to all of his children that he pined for as a child. And but for the instant case, Mr. Irizarry was well on his way to completely fulfilling that role.

**Mr. Irizarry's Offense Conduct**

In March 2021, before he started working as a porter and after spending most of the money from his settlement with New York City, Mr. Irizarry had turned back to his Percocet habit. It was during this time that Mr. Irizarry was approached by a man he met in prison with an opportunity to participate in a one-time drug deal to make some money and support his own habit. Mr. Irizarry knew that he should have declined the man's offer and walked away. But with the uncertainty of the pandemic looming over his head and the money from the settlement check all but gone, Mr. Irizarry gave into temptation and picked up a package of drugs from the man. From that one-time purchase, Mr. Irizarry broke up the package and sold it in small, hand-to-hand increments over a few months. Ultimately, Mr. Irizarry estimates he made a few thousand dollars, all of which went to supporting his own habit and to Ms. Rodriguez and his children.

By the time Mr. Irizarry had sold off his supply, he had already been working full time as a porter for several months. Mr. Irizarry much more preferred making a legitimate living; although he knew it was possible to obtain more drugs to sell, unlike before, he now had much more to lose. Mr. Irizarry's desire to continue to



*Mr. Irizarry and Naimah*

build and care for a family with Ms. Rodriguez helped him finally see things clearly and realize that selling drugs to make "easy" money was a selfish decision that put him, his family, and his community in jeopardy. Indeed, by the time he was arrested for the instant case in July 2022, Mr. Irizarry had stepped away from the drug game.

Upon his arrest, Mr. Irizarry was appalled to learn that the drugs he obtained and sold contained fentanyl. It terrifies him that someone could have easily died because of his actions, and he is immensely grateful that nobody was killed. When his daughter Naimah was born this past April, Mr. Irizarry was brought to tears at the thought of her growing up to learn about his role in peddling

dangerous drugs. He continues to feel extremely guilty and ashamed for his conduct and knows that he deserves to be punished for breaking the law.

## Mr. Irizarry's Post-Offense Rehabilitation and Health Concerns



Last July when Mr. Irizarry was arrested and brought to federal court in handcuffs, he was scared. Mr. Irizarry had never been through the federal system before and knew of its reputation as an intimidating and unforgiving environment. Bracing himself for pre-trial detention at MDC Brooklyn, Mr. Irizarry began to prepare himself mentally for a prolonged separation from Ms. Rodriguez and their (at the time) three children.

Fortunately for Mr. Irizarry, however, his family was there to help him in his hour of need. His wife, Ms. Rodriguez, came to the courthouse to support him and to serve as a testament to the responsible and caring side of Mr. Irizarry that she knew best. Mr. Irizarry's mother also immediately expressed a willingness to take him in and to have Pre-Trial Services inspect her home. Over the Government's objection, and despite the presumption in favor of his detention, Mr. Irizarry persuaded Magistrate Judge Wang to release him to home detention, enforced by location monitoring, at his mother's residence.

*Mr. Irizarry and his family*

Since his presentment, Mr. Irizarry has been a stellar supervisee. He continues to work full time as a porter for 144 West 124th Street in Harlem where he is a responsible, enthusiastic, and dependable employee. He has never failed to provide a paystub to Pre-Trial Services and, while he recently submitted positive urinalyses for marijuana and opiates, he has been transparent with his pre-trial officer about his struggles with substance abuse and willingly participates in outpatient mental health and substance abuse treatment. Mr. Irizarry has also



obtained steady downgrades and one-time modifications of his bail conditions, having always scrupulously adhered to his pre-trial officer's directives.

Due to his progress, shortly before his daughter Naimah was born, Mr. Irizarry received Pre-Trial Service's blessing and the Court's permission to return to Ms. Rodriguez's apartment, where he continues to reside



under a curfew. As a result of the modification, Mr. Irizarry was present for Naimah's birth and able to be a caring and responsible partner to Ms. Rodriguez while she convalesced at home.

Crucially, Mr. Irizarry has recently experienced shortness of breath and heart palpitations, which caused his primary care physician to refer him to a cardiologist. The cardiologist's initial work up, which consisted of an electrocardiogram and an exercise stress test, revealed premature ventricular contractions with exercise (*i.e.*, extra beats from his heart's bottom chamber) that, coupled with his other symptoms, suggest a possible blockage of Mr. Irizarry's coronary vessels. *See* Letter from Dr. Tarek Makki, Exhibit B (letter from a heart specialist interpreting Mr. Irizarry's medical records).[1] The cardiologist recommended that Mr. Irizarry undergo a left heart catheterization and a coronary angiography to determine whether any blockages exist sufficient to justify further surgical intervention, like stenting or open heart surgery—a recommendation with which Dr. Tarek Makki concurs. *Id.* Mr. Irizarry—who is presently insured through Fidelis Care New York—has a follow up appointment with his cardiologist this Friday, November 3, 2023.

**In the absence of any public safety or risk-of-flight concerns, the decrepit conditions of MDC Brooklyn and Mr. Irizarry's cardiac issues combine to present exceptional circumstances justifying his continued release on bail.**

Mr. Irizarry knows that he has to be punished for his conduct and that he must take responsibility for his mistakes. And facing a mandatory 60 months' imprisonment (ten months below the bottom of his presumptive guidelines range of 70 to 87 months), Mr. Irizarry knows that he will be punished. Nevertheless, remanding him now in advance of sentencing is not appropriate, as he presents no threat to public safety, no risk of flight, and would face irreparable harm should he be remanded to MDC Brooklyn before he is able to determine whether he suffers from any coronary blockages requiring stenting or open heart surgery.

Under 18 U.S.C. § 3143(a)(2), a defendant who pleads guilty to a controlled substance offense with a maximum penalty of ten years or more and is awaiting sentence "shall," ordinarily, "be detained" unless 1) there is "a substantial likelihood that a motion for acquittal or new trial will be granted," or the government recommends that "no sentence of imprisonment be imposed on the person," and 2) the Court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." 18 U.S.C. § 3143(a)(2)(A)-(B).

---

[1] The defense can make Mr. Irizarry's underlying medical records available to the Court and the Government upon request.

But there is another option: "A person subject to detention pursuant to section 3143(a)(2) … and who meets the conditions of release set forth in section 3143(a)(1)" may be granted bail "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c). The first element of the test under section 3145(c) requires the Court to determine "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1). The second element of section 3145(c) requires the Court to assess whether there are "exceptional reasons" justifying a defendant's release. "Exceptional reasons" are those presenting "a unique combination of circumstances giving rise to situations that are out of the ordinary." *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991). Thus, "[t]he test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.'" *United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004).

*United States v. Dwight Boyd*, No. 21 Cr. 486 (SHS), Dkt. No. 74 (S.D.N.Y. Feb. 3, 2022) is illustrative. There, the defendant was one of four who were charged with participating in a crack cocaine distribution conspiracy. He pleaded guilty to a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846, but faced career offender guidelines of 151 to 188 months' imprisonment. Following his guilty plea, however, Judge Stein declined to remand Boyd.

First, Judge Stein determined that Boyd was neither a public safety risk nor a risk of flight primarily because he had been in the community without incident for six months under a bond co-signed by three financially responsible persons and had a union job. Second, Judge Stein determined that "exceptional reasons" militated against Boyd's automatic remand because of the awful conditions at MDC Brooklyn and Essex County Correctional Facility driven by rampant overcrowding and the COVID-19 pandemic. Notably, Judge Stein applied the same logic to one of Boyd's co-defendants (Barbaro Bonilla) who pleaded guilty to a violation of 21 U.S.C. § 841(b)(1)(B) on April 20, 2022 and was not safety-valve eligible.

More recently, Judge Engelmayer extended *Boyd* to the post-COVID context in *United States v. Arias* (*infra*), a case involving an individual who pleaded guilty to possessing *kilograms* of fentanyl. Specifically, after determining that Arias did not present a risk of flight or a danger to the community, Judge Engelmayer continued Arias's bail primarily because of the decrepit conditions at MDC Brooklyn, noting that, notwithstanding the pandemic's wane, "the conditions at the MDC remain unacceptable. They have been described to me by too many people in too many cases for it any longer to be factually disputable that that is just an inhospitable, terrible place to be." *Arias*, 22 Cr. 495 (PAE), Plea Tr. (Exhibit A) at 33. Thus, Judge Engelmayer concluded that "[u]nder those circumstances, until the

… Bureau of Prisons really can get its act together with that facility, m23-6-y judgment is that where a defendant is not a risk of flight, is not a danger to the community, and there aren't special reasons for them to be remanded, avoided putting a defendant in conditions like that qualifies as an exceptional reason under 3145(c)." *Id.*

Mr. Irizarry presents even more compelling grounds for bail pending sentencing than Arias and Boyd. Mr. Irizarry has been on bail for the past 15 months and counting without any police contact—two-and-a-half times longer than the time Boyd had been on bail when he pleaded guilty. Mr. Irizarry is gainfully employed and is the sole provider for his wife, infant, and young children. He has never failed to provide pre-trial services with a paystub and he enthusiastically engages in outpatient mental health and substance abuse treatment. He has never violated his curfew and maintains a close connection with the two co-signers to his $50,000 personal recognizance bond. Mr. Irizarry plainly does not pose a risk of flight or a danger to the community.

Nor are the conditions at MDC Brooklyn any less awful than they were at the time Arias pleaded guilty this past May. Indeed, on June 23, 2023, Rhonda Barnwell, President of AFGE Local 2005 wrote a memorandum to BOP Regional Director Amy Boncher lamenting the chronic understaffing at MDC Brooklyn as "inhumane to both staff and inmates." *See* Barnwell Memo (attached as Exhibit C). Compounding understaffing is the facility's failure to provide adequate medical care to detainees. For example, a detainee named Raul Acosta obtained a medical order at the time of his presentment commanding MDC Brooklyn to facilitate the surgical repair of his eye socket following his transfer from Rikers Island (where his face had been broken by another inmate). *See United States v. Raul Acosta*, No. 23 Cr. 376 (JLR) at Dkt. No. 5 (S.D.N.Y. July 19, 2023). The surgery had already been scheduled and arranged at Bellevue Hospital at the time of Mr. Acosta's presentment in federal court; all MDC Brooklyn had to do was transport him. After three months and numerous emails with MDC Brooklyn's Court Liaison, however, Mr. Acosta still had not received his surgery. By the time he appeared in front of Judge Rochon for his guilty plea on October 4, 2023, Mr. Acosta had been informed by medical staff that his face would have to be rebroken before the surgery because it had healed improperly on its own.

Of course, Mr. Irizarry's exceptional reasons for continuing his bail do not just turn on the terrible conditions at MDC Brooklyn, but also on the need for him to obtain medical treatment necessary to determining whether he has coronary artery blockages and must undergo stenting or open heart surgery. Exhibit B. The Court can have no confidence whatsoever that Mr. Irizarry will receive the kind of individualized, careful medical attention he requires if he is remanded to MDC Brooklyn. To the contrary, if he is remanded now, his treatment will be indefinitely interrupted, his condition will likely worsen, and his potentially-blocked arteries

will go unaddressed. Mr. Irizarry is facing a serious prison sentence and he must eventually go to prison. The interests of justice, however, are not served by remanding him prematurely before he can obtain an accurate diagnosis and receive any surgical treatment necessary to protect him from a heart attack.

The defense acknowledges that the Court may be reluctant to find a categorical exception to mandatory remand under 18 U.S.C. § 3143(a)(2) because of the extreme conditions at MDC Brooklyn. But the Court need not go that far to grant Mr. Irizarry relief given the unusual circumstances surrounding his heart—circumstances that bear directly on the Court's application of the § 3553(a) factors to Mr. Irizarry and any recommendations that the Court makes to BOP regarding his designation and medical care. The totality of Mr. Irizarry's circumstances weighs against his immediate remand and sufficiently satisfies the strictures of 18 U.S.C. § 3145(c). Accordingly, the Court should continue Mr. Irizarry's bail pending sentencing.

Respectfully Submitted,

Andrew John Dalack, Esq.
Assistant Federal Defender
Federal Defenders of New York
(646) 315-1527

Cc:     Government Counsel

9